ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with account identified as<br>"hkaybabylo" that is stored at premises controlled by<br>Instagram LLC. | )<br>)<br>) Case No.   **SA16-425M**<br>)<br>)<br>) |

## 18 U.S.C. § 2703 SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A

FILED
2016 OCT 18  PM 2:09
CLERK

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

   See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit is incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before      14 days from the date of its issuance
                                                                                                  *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been
                                                                            established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                                                         *(name)*

IT IS FURTHER ORDERED that the Provider named in Attachment A shall comply with the further orders set forth in Attachment B, and shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

Date and time issued:    9/9/16   10:30 a.m.           _Kan E. Scott_
                                                                                                  *Judge's signature*

City and state:   Santa Ana, California                   Karen E. Scott, U.S. Magistrate Judge
                                                                                          *Printed name and title*

AUSA: Scott D. Tenley x2829

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: SA16-425M | Date and time warrant executed: 9-12-16    1048AM | Copy of warrant ~~and inventory~~ left with: PROVIDED TO DEF. COUNSEL |
| Inventory made in the presence of : S/A RYAN STEARMAN | | |

Inventory of the property taken and name of any person(s) seized:
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

Multiple photographs posted by the subject account depicting Derrick Smith alone and with co-conspirators. Photographs also contained comments left by the subject account and other accounts.

**Certification** (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date: 10-18-16

_____
Executing officer's signature

Special Agent Ryan Averill
Printed name and title

## AFFIDAVIT

I, Ryan Averill, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since May 2015.  I successfully completed the Criminal Investigations Training Program at the Federal Law Enforcement Training Center, Brunswick, Georgia.  I also completed the ATF SA Basic Training National Training Academy in Brunswick, Georgia.  During these courses of study, I received training in the investigation of federal firearm and explosive violations.  Before becoming a Special Agent with the ATF, I was employed as a Patrol Officer with the City and County of Honolulu Police Department ("HPD") for approximately four years.

2.    In the course of my training and experience, I am familiar with and have used a variety of investigative techniques and resources, including physical surveillance, interviews, the utilization of undercover agents and informants, and the review of various databases and records.  I have also received training during the course of my employment as an ATF Special Agent in various topics, including but not limited to, illegal trafficking of firearms, the utilization of informants, the activities of criminal street gangs, asset forfeiture, and conducting surveillance -- both actual and digital.

3.    I make this affidavit in support of an application for a search warrant for information associated with the account

identified as "hkaybabylo" (the "SUBJECT ACCOUNT") that is stored at premises controlled by Instagram LLC (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered 1601 Willow Road, Menlo Park, CA 94025.[1] The information to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d). To obtain the basic subscriber information, which do not contain content, the government needs only a subpoena. See 18 U.S.C. § 2703(c)(1), (c)(2). To obtain additional records and other information--but not content-- pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d). The requested warrant calls for both records containing content (see Attachment B paragraph 11.10.a) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b).

communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

4.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(u) (theft of firearms from a federal firearms licensee), and 18 U.S.C. § 922(g) (unlawful possession of a firearm).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   STATEMENT OF PROBABLE CAUSE

### A.   The Indictment

6.    On December 2, 2015, a federal grand jury sitting in the Central District of California returned an indictment (the

3

"Indictment"), charging eight defendants in connection with a series of burglaries and attempted burglaries of federally-licensed firearms dealers and firearms-related business which occurred in Los Angeles, Orange, and Riverside Counties between August 29, 2015 and November 7, 2015.  A true and correct copy of the Indictment is attached hereto as Exhibit 1, and incorporated by reference fully herein.

7.   In summary, and as relevant to this Affidavit, the Indictment alleges that DERRICK ANTHONY SMITH ("SMITH") participated in the following burglaries and attempted burglaries:

a.   August 29, 2015 burglary of Orange County Firearms, in which thirty-six firearms were stolen;

b.   September 2, 2015 attempted burglary of FMK Firearms;

c.   September 2, 2015 attempted burglary of SureFire Institute;

d.   September 2, 2015 burglary of Rifle Gear Company in which fifty firearms were stolen;

e.   September 17, 2015 attempted burglary of American Pacific Rifle Works;

f.   September 17, 2015 attempted burglary of Warrior One; and

g.   November 7, 2015 burglary of ExaTactical Firearms in which thirty nine firearms were stolen.

See generally Count One.

8.   In many of the burglaries, SMITH is alleged to have used an ax or sledgehammer to break a glass door or window to allow SMITH and his conspirators to access the business.  (See, e.g., Count One at Overt Acts 3, 7.)

9.   Defendant FAIZON AZANTE DONNIE ("DONNIE") is also charged in the Indictment and is alleged to have participated, along with SMITH, in those burglaries and attempted burglaries that occurred on September 2, 2015 and November 7, 2015.

10.   The Indictment further alleges that, after successfully burglarizing a firearms related business, the conspirators, including SMITH, returned to a residence located at 327 1/2 West 53rd Street, Los Angeles, California ("West 53rd Street Residence") to divide up the stolen firearms among the conspirators.

11.   The case is set for trial before the Honorable Cormac J. Carney, United States District Judge, on October 11, 2016.

**B.   The SUBJECT ACCOUNT**

1.   Identification of the SUBJECT ACCOUNT

12.   On or around September 6, 2016, I conducted a consent search of an Instagram account belonging to a cooperating witness (the "CW").[3]  The CW is named in the Indictment and is

---

[3] The CW has pleaded guilty pursuant to a cooperation plea agreement and is providing information and assistance to law enforcement in the hope of receiving consideration at sentencing.  The CW has five prior felony convictions, including one federal drug felony.  During the CW's post-arrest interview, the CW falsely implicated an individual named "Lexi" in the firearms burglaries.  The CW subsequently corrected the statement regarding "Lexi" on the CW's own volition, before law enforcement determined it was not true.  With that exception, law enforcement has otherwise found information provided by the CW to be reliable and corroborated by other evidence.

alleged to have participated, along with SMITH, in the burglaries identified in the Indictment.

13. The CW "follows" an Instagram account with user name "hkbabylo" (i.e. the SUBJECT ACCOUNT). As a "follower" of the SUBJECT ACCOUNT, the CW's account can access content in the SUBJECT ACCOUNT. Accordingly, I was able to review the content of the SUBJECT ACCOUNT while logged into the CW's account pursuant to the CW's consent.

14. Based on the following facts, I believe that SMITH is the account holder for the SUBJECT ACCOUNT:

a. The account contains a "profile picture" which I recognize to be SMITH based on my review of a DMV image of SMITH.

b. The account contains many posts that feature SMITH. In a number of the posts, SMITH's distinctive facial tattoos – which are also visible in SMITH's DMV record – are easily identifiable. In particular, SMITH has a distinctive cross tattoo next to his left eye.

c. The user name of the SUBJECT ACCOUNT contains SMITH's moniker: "Baby Lo." According to my review of investigative reports and my conversations with ATF SA Ryan J. Stearman, the lead case agent in this investigation, I learned that according to the CW, SMITH's moniker (or street name) is "Baby Lo." This is corroborated by other evidence developed during the investigation:

i. Text messages between the CW and a co-conspirator ("CC-1") exchanged hours before SMITH, CW, and CC-1

attempted two burglaries in Riverside County reference "BL" wanting to go to "work."

        ii.  Based on my training and experience, and knowledge of the investigation, I know "work" to be coded language used to refer to criminal conduct. For that reason, I believe CW and CC-1 were communicating that "BL" – short for "Baby Lo" (i.e. SMITH) – wanted to commit burglaries that evening. Several hours later, CW, CC-1, and SMITH did in fact attempt to steal firearms.

        d.  Several photographs on the SUBJECT ACCOUNT feature SMITH with DONNIE, one of SMITH's co-conspirator's charged in the Indictment.

        2.  <u>Relevant Evidence within the SUBJECT ACCOUNT</u>

    15.  Based on my review of photographs or "posts" to the SUBJECT ACCOUNT, I believe that the account contains evidence of the crimes charged in the Indictment, as well as other relevant evidence in the case. This conclusion is based on my training and experience, my knowledge of the investigation, and my conversations with SA Stearman and the Assistant United States Attorney prosecuting this matter. In particular:

        a.  A post which indicates it is 52-weeks-old depicts SMITH and DONNIE. SMITH is smiling and holding a fanned out stack of what appear to be $100 bills. SMITH has two pistols tucked into his waistband.[4] DONNIE is flashing what appears to

---

[4] The pistol near SMITH's right hip is plainly visible. The pistol near SMITH's left hip has a black handle which blends in with SMITH's clothing. However, the silver slide of the pistol is visible as are parts of the site on top of the slide.

be a gang sign.  A true and correct copy of the post is attached as Exhibit 2.

i.   Because I viewed the post on or around September 6, 2016, a posting made 52 weeks prior would have been made at or around the time of the Rifle Gear burglary, which occurred on September 2, 2015 (also the attempted firearms thefts at SureFire Institute and FMK Firearms).  The information sought pursuant to this warrant would allow investigators to determine the precise date when this post was made, and may also include geolocation data related to the location of the user at the time of the post.

ii.   SA Stearman advised me that, based on his participation in the search warrant of the West 53rd Street residence, in the post, SMITH and DONNIE are in what appears to be rearmost bedroom of the West 53rd Street residence (the residence used as the stash house for the stolen firearms).  The investigation has determined that the conspirators returned to that residence after conducting burglaries.

b.   Another post, also 52-weeks-old, depicts SMITH and DONNIE in an area that SA Stearman has advised me is the backyard/garage area associated with the West 53rd Street residence.  SMITH and DONNIE both are flashing what appear to be gang signs, and appear to be happy or celebratory.

i.   Based on my review of investigative reports, I know that when SMITH was arrested inside the West 53rd Street residence on November 7, 2016, dozens of stolen firearms were located in the garage area depicted in this photograph.

8

ii.  The "hkaybaby1o" account also makes a comment or caption to the post which states "My young nigga AK[.]"

iii. The investigation has determined that DONNIE's nickname is "AK" or "Ace Kapone."  Thus, this post corroborates that information, and further associates SMITH with DONNIE.

c.  Another post, also 52-weeks-old, depicts SMITH and a woman, with the woman's head resting on SMITH's shoulder. "hkaybaby1o" captioned the photograph "me n my trippin ass moosie lmfao[.]"

i.  The woman depicted in the post is SMITH's wife or girlfriend, La Creisha Williams.  I know this through my conversations with SA Stearman, as well as my review of an Instagram account for "lsb_is_winning" which depicts Williams in the profile photograph, includes the phrase "Derrick's Wife" and features dozens of posts with SMITH's photograph.

ii.  I reviewed a DMV image for La Creisha Williams and it depicts the same individual in the profile photograph for the "lsb_is_winning" account.

iii. CW has stated that SMITH's wife's moniker is "Moosie."

iv.  CW has stated that "Moosie" was present at the West 53rd Street residence on November 7, 2016 when the stolen firearms were divided up amongst the conspirators.  CW's text messages later that morning include an exchange with "Moosie" where CW inquires whether CW left any stolen firearms

9

at the West 53rd Street residence.  Accordingly, this post on
the SUBJECT ACCOUNT corroborates CW's statements regarding the
events of November 7, 2016.

      d.  Another post, 157-weeks-old, depicts DONNIE, with
the caption "i miss my lil nigga on god @tiny-acekapone[.]"

      i.  Based on my training and experience, I know
that "on god" is a common phrase used to denote a truthful
statement, akin to "I swear."

      ii.  This post further corroborates SMITH's
relationship with DONNIE, as well as one of DONNIE's monikers,
"AK."

      e.  Another post, 162-weeks-old (approximately July
2013), depicts SMITH holding a pistol in one hand and cash in
another hand.

      i.  As reflected in Count Six of the Indictment,
SMITH was convicted of a felony crime on October 20, 2011.
Thus, at the time the photograph of SMITH holding a firearm was
posted, he was not permitted to possess a firearm.  Thus, I
believe this photograph is relevant to, among other things,
SMITH's illegal possession of a firearm as charged in Count Six.

      f.  Another post, also 162-weeks-old, depicts SMITH
pointing the firearm at the individual who took the photograph.

      i.  A commenter to the post wrote, "Let me buy
that bro[.]"  "hkaybabylo" responded, "we don't sell these put
um to work but i'm comin bacc wit some."

      ii.  Based on my training and experience, I know
that "work" is common slang for committing crimes.  Accordingly,

I believe SMITH is communicating that he is using that firearm for other criminal activity, but will soon have other firearms that can be sold to the commenter.

g.   Another post, also 162-weeks-old, depicts SMITH seated in a chair with a fanned out stack of U.S. currency.

i.   "hkaybabylo" commented or captioned the photo to state "traplife."  "Trap" is a slang term for the area where drug deals are carried out.[5]

16.  Beyond the items that were viewable through CW's account, which have law enforcement investigative value, I also know that based on my training, experience, and conversations with other law enforcement agents, privacy settings for the PROVIDER may be restricted so that not all items on a user's page may be viewable to the public or to specific users to which the SUBJECT ACCOUNT is connected.  I understand that private messages between the PROVIDER's users are not viewable by the public.  Thus, additional evidence of the relationship among the user of the SUBJECT ACCOUNT and others, photographs, and communications with other conspirators through chats or private messages in the SUBJECT ACCOUNT may be in non-public areas of the accounts, unavailable through law enforcement's current means of access to the SUBJECT ACCOUNT.

17.  In particular, postings and geolocation data associated with postings, photographs, or check-ins may allow investigators to determine the location(s) of the user of the

---

[5] See http://www.urbandictionary.com/define.php?term=Trap, last visited September 8, 2016.

SUBJECT ACCOUNT on the day of the burglaries, or other relevant dates.

18.   Providers of e-mail and social media often maintain have access to and store information related to the location of the users of accounts they service.  That information may be obtained by the provider in a number of ways.  For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.

19.   In addition, because SMITH is alleged to be involved in a criminal conspiracy, evidence of his association is relevant and critical to establishing the criminal relationship. To that end, evidence that the conspirators are "friends," "followers," or featured in the same photograph is probative evidence of that relationship.  Based on my training and experience, including regarding the PROVIDER (as discussed below), I believe there may be additional, non-public information regarding the SUBJECT ACCOUNTS that could hold evidentiary value, including, for example, messages, photographs, or geolocation data.

20.   On approximately September 8, 2016, an Assistant United States Attorney sent the PROVIDER a preservation letter requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

21.  Other than what has been described herein, to my
knowledge the United States has not attempted to obtain the
contents of the SUBJECT ACCOUNT by other means.

### III.  BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

22.  In my training and experience, I have learned that
providers of social media services offer a variety of online
services to the public.  Providers, like the PROVIDER, allow
subscribers to obtain accounts like a SUBJECT ACCOUNT.
Subscribers obtain an account by registering with the PROVIDER.
During the registration process, the PROVIDER asks subscribers
to provide basic personal information.  Therefore, the computers
of the PROVIDER are likely to contain stored electronic
communications and information concerning subscribers and their
use of the PROVIDER's services, such as account access
information, e-mail or message transaction information, and
account application information.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.

23.  A subscriber of the PROVIDER can also store with the
PROVIDER files in addition to messages, such as contact or buddy
lists (in the form of "followers"), calendar data, pictures or
photos or videos and other files, on servers maintained and/or
owned by the PROVIDER.  In my training and experience, evidence
of who was using an account may be found in such information.

24.   In my training and experience, social media providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

25.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to

14

identify which computers or other devices were used to access a
SUBJECT ACCOUNT.

26. In my training and experience, social media account
users will sometimes communicate directly with the service
provider about issues relating to the account, such as technical
problems or complaints from other users. Providers of e-mails
and social media services typically retain records about such
communications, including records of contacts between the user
and the provider's support services, as well records of any
actions taken by the provider or user as a result of the
communications. In my training and experience, such information
may constitute evidence of the crimes under investigation
because the information can be used to identify the user(s) of a
SUBJECT ACCOUNT.

27. I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time. Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider. They may also be used by
multiple people. Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account. Only by piecing together information contained in the
contents of an account may an investigator establish who the

15

actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

     28.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

     29.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss

aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

30.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER under seal until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be impossible for the PROVIDER to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the PROVIDER kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the PROVIDER to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the

17

PROVIDER to examine a particular document found by the search team and confirm that it was a business record of the PROVIDER's taken from a SUBJECT ACCOUNT.

b.    I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## IV.    Services Provided by Instagram

31.  Based on a review of information provided by Instagram regarding its services, information provided by other law enforcement officers, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Instagram.

32.  Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, or "bio," a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a

special electronic application ("app") created by the company
that allows users to access the service through a mobile device.

33.   Instagram permits users to post photos and videos to
their profiles on Instagram and otherwise share photos and
videos with others on Instagram, as well as certain other
social-media services, including Flickr, Facebook, and Twitter.
When posting or sharing a photo or video on Instagram, a user
can add the following to the photo/video: a caption; various
"tags" that can be used to search for the photo/video (e.g., a
user may add the tag "#vw" so that people interested in
Volkswagen vehicles can search for and find the photo/video);
location information, including geotags or a location name; and
other information.  A user can also apply a variety of "filters"
or other visual effects that modify the look of the posted
photos and videos.  In addition, Instagram allows users to make
comments on posted photos and videos, including photos and
videos that the user posts or photos and videos posted by other
users of Instagram.  Users can also "like" photos and videos,
meaning that they can express approval of a photo or video by
using Instagram's "like" feature.

34.   Upon creating an Instagram account, an Instagram user
must create a unique Instagram username and an account password.
This information is collected and maintained by Instagram.

35.   Instagram asks users to provide basic identity and
contact information upon registration and also allows users to
provide additional identity information for their user profile.
This subscriber information may include the user's full name, e-

19

mail addresses, and phone numbers, as well as other personal information provided directly by the user to Instagram.  Once an account is created, users may also adjust various privacy and account settings for the account on Instagram.  Instagram collects and maintains this information.

36.  Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public.  Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles.  Instagram collects and maintains this information.

37.  Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user.  Users may also "unfollow" users, that is, stop following them or block them, which prevents the blocked user from following that user.

38.  Instagram allows users to post and share various types of user content in their galleries, including photos, videos, captions, comments, and other materials.  Such items can contain metadata, i.e., content about the data such as the date and time the photo or video was taken.  Instagram collects and maintains user content that users post to Instagram or share through Instagram.

39.  Instagram users may send photos and videos to select individuals or groups via Instagram Direct.  Information sent

via Instagram Direct does not appear in a user's feed, search history, or profile.

40.   Users on Instagram may also search Instagram for other users or particular types of photos or other content.

41.   For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record are the particular web request, any Internet Protocol ("IP") address associated with the request, the type of browser used, any referring/exit web pages and associated URLs, the pages viewed, the dates and times of access, and other information.

42.   Instagram also collects other data associated with user content.  For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of certain activities, such as where a photo or video was taken, and which may include latitude and longitude information, comments on photos, and other information.  Such information can assist in plotting the location of photographs, videos, or other content posted by the user, which would be evidence of the user's location, or similar information by persons followed by or in contact with the user.

43.   As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to

establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, an Instagram user's account activity, IP address logs, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was accessed or used. For example, as described herein, Instagram logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows users to "tag" their location in posts and allows Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner.

44. Finally, Instagram account activity may provide relevant insight into the Instagram account owner's state of

mind as it relates to the offense under investigation.  For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45.    Therefore, the computers of Instagram are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, transaction information, and other account information.

## V.    REQUEST FOR NON-DISCLOSURE

46.    Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant because there is reason to believe that such notification will result in: (1) destruction of or tampering with evidence; (2) intimidation of potential witnesses; and (3) otherwise seriously jeopardizing the investigation, including co-conspirators further masking their communications in the future.

## VI.   <u>CONCLUSION</u>

47.   Based on the foregoing, I request that the Court issue the requested search warrant.


_____/S/_____

Ryan Averill, Special Agent
Bureau of Alcohol Tobacco
Firearms & Explosives


Subscribed to and sworn before me
on September 9 , 2016.

   KAREN E. SCOTT

_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

24

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the account identified as hkaybabylo that is stored at premises controlled by Instagram, a company that accepts service of legal process at Instagram LLC, Attn:  Law Enforcement Response Team, 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B

### I.    SEARCH PROCEDURE

1.    The search warrant will be presented to personnel of Instagram LLC (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  In conducting this search, the search team shall take notes regarding how it conducts the search.

5.    If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the

i

items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 120-day period.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred on or after July 1, 2013, including:

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures or photos, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

iv.  All communications or other messages sent or received by the account, including via Instagram Direct;

v.  All user content created, uploaded, or shared by the account, including any comments made by the account on photographs, videos, or other content;

vi.  All photographs, videos, images, comments, captions, and hashtags, as well as any metadata associated therewith, in the user gallery for the account;

vii. All location data associated with the account, or with photographs, videos, or other content, including geotags;

viii.   All records of Instagram searches performed by the account, including all past searches saved by the account; and

ix.  All information about connections between the account and third-party websites and applications.

x.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.  All other records and information, including:

i.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a, including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

ii.  All subscriber information pertaining to the SUBJECT ACCOUNT, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), other account names or e-mail addresses associated with the account, telephone numbers, physical addresses, and other identifying information regarding the subscriber, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records.

iii. A list of all of the people that the user follows on Instagram and all people who are following the user (i.e., the user's "following" list and "followers" list), as well as any "friends" of the user;

iv.  A list of all users that the account has "unfollowed" or blocked;

v.   All privacy and account settings, including past and present account status.

vi.  Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or receiving a message using the SUBJECT ACCOUNT or accessing or logged into a SUBJECT ACCOUNT.

### III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For the SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.    All information described above in Section II.10.a that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, 371 (conspiracy), Title 18, United States Code, Section 922(u) (theft of firearms from a federal firearms licensee), and Title 18, United States Code, Section 922(g)(1) (unlawful possession of a firearm by a felon); those violations involving DERRICK ANTHONY SMITH, and occurring on and after July 1, 2013, namely:

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.    Messages, photographs, videos, "likes," or any other content (whether or not created by the user) regarding firearms, burglaries, gang membership, cash, burglary tools, and association with individuals named in the Indictment or La Criesha Williams.

iii. Friend status, "Likes," communications, messages, friend request data, tags, or other data or information showing any connection or relationship between or among the users of the SUBJECT ACCOUNT.

iv.  All information associated with the posts described in the affidavit.

b.    All records and information described above in Sections II.10.b.

### IV.  PROVIDER PROCEDURES

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the

service of this warrant.  The PROVIDER shall send such
information to:

> Special Agent Ryan Averill
> Bureau of Alcohol, Tobacco, Firearms and Explosives
> 34 Civic Center Plaza, Suite 6121
> Phone number: (714) 347-9100
> Fax number: (714) 347-9101
> E-mail: Ryan.K.Averill@usdoj.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide
the name and contact information for all employees who conduct
the search and produce the records responsive to this warrant.
IT IS FURTHER ORDERED that the PROVIDER shall not notify any
person, including the subscriber(s) of each account identified
in Attachment A, of the existence of the warrant.

FILED

COPY

2015 DEC -2 AM II: 35

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2015 Grand Jury

**SACR15-00150**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>EDDIE LEE HARRIS, JR.,<br>  aka "Baby Syke,"<br>DERRICK ANTHONY SMITH,<br>BRITTANI NICOLE COLLINS,<br>KENNETH TERELL MULLEN,<br>FAIZON AZANTE DONNIE,<br>KEON MENA,<br>DAVELL DEJON MENA, and<br>TEOPHELUS LEE USHER,<br>  aka "T.O.,"<br><br>       Defendants. | SA CR No. 15-<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy to<br>Commit Theft of Firearms from a<br>Federal Firearms Licensee; 18<br>U.S.C. § 922(u): Theft of Firearms<br>From a Federal Firearms Licensee;<br>18 U.S.C. § 922(g)(1), (9):<br>Prohibited Person in Possession of<br>Firearms] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

//

//



1.   Orange County Firearms LLC ("Orange County Firearms"), located in Fountain Valley California, was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

2.   Uber Inc., a corporation doing business in Fountain Valley, California as Rifle Gear Company ("Rifle Gear"), was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

3.   Mr. & Mrs. Pet, LLC, a corporation doing business in La Puente, California as ExaTactical Firearms ("ExaTactical Firearms"), was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

4.   Villin Industries, Inc., a corporation doing business in Riverside, California as Warrior One ("Warrior One"), was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

5.   Merlyn Rifleworks, Inc., a corporation doing business in Riverside, California as American Pacific Rifleworks ("American Pacific Rifleworks"), was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

6.   DG JF Enterprises, Inc., a corporation doing business in Burbank, California as Gun World ("Gun World"), was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

7.   Philip Sirilertjanya and James Janya, people doing business in Burbank, California as Guns Direct ("Guns Direct"), were licensed to engage in the business of importing, manufacturing, and dealing in firearms.

2

8.   Dennis Si-Ye Lin, a person doing business in City of Industry, California as Gun Effects ("Gun Effects"), was licensed to engage in the business of importing, manufacturing, and dealing in firearms.

9.   FMK Firearms was a firearms manufacturer located in Placentia, California.

10.  SureFire Institute was a business that specialized in firearms training for law enforcement and military personnel located in Yorba Linda, California.

11.  Tactical Pro Shop was a firearms equipment supplier located in Burbank, California.

B.   OBJECT OF THE CONSPIRACY

Beginning no later than on or about August 29, 2015, and continuing to on or about November 7, 2015, in Orange County, Los Angeles County, and Riverside County, within the Central District of California, and elsewhere, defendants EDDIE LEE HARRIS, JR., also known as ("aka") "Baby Syke" ("HARRIS"), DERRICK ANTHONY SMITH ("SMITH"), BRITTANI NICOLE COLLINS ("COLLINS"), KENNETH TERELL MULLEN ("MULLEN"), FAIZON AZANTE DONNIE ("DONNIE"), KEON MENA ("KEON MENA"), DAVELL DEJON MENA ("DAVELL MENA"), and TEOPHELUS LEE USHER, aka "T.O." ("USHER"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit theft of firearms from a federal firearms licensee, in violation of Title 18, United States Code, Section 922(u).

C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

3

1      1.    Defendants HARRIS and SMITH would identify federal firearms

2  licensed businesses to be burglarized.

3      2.    Defendants COLLINS, MULLEN, and KEON MENA would drive

4  conspirators to federal firearms licensed businesses.

5      3.    Defendant SMITH would force entry into federal firearms

6  licensed businesses using an ax.

7      4.    Defendants HARRIS, SMITH, COLLINS, MULLEN, DONNIE, KEON

8  MENA, DAVELL MENA, and USHER would steal firearms from federal

9  firearms licensed businesses.

10 D.   OVERT ACTS

11      In furtherance of the conspiracy, and to accomplish the object

12 of the conspiracy, on or about the following dates, defendants

13 HARRIS, SMITH, COLLINS, MULLEN, DONNIE, KEON MENA, DAVELL MENA, and

14 USHER, and others known and unknown to the Grand Jury, committed

15 various overt acts in Orange County, Los Angeles County, and

16 Riverside County, within the Central District of California, and

17 elsewhere, including, but not limited to, the following:

18      Overt Act No. 1:    On or about August 29, 2015, defendant

19 COLLINS drove to Orange County Firearms, with defendants HARRIS and

20 SMITH as passengers.

21      Overt Act No. 2:    On or about August 29, 2015, defendant

22 MULLEN drove to Orange County Firearms.

23      Overt Act No. 3:    On or about August 29, 2015, defendant SMITH

24 forced entry into Orange County Firearms by breaking the front glass

25 door with an ax.

26      Overt Act No. 4:    On or about August 29, 2015, defendants

27 HARRIS, SMITH, COLLINS, and MULLEN stole approximately thirty-six

28

4

1 firearms from the premises of Orange County Firearms, including hand

2 guns, rifles, shotguns, and silencers.

3     Overt Act No. 5:   On or about September 2, 2015, defendants

4 HARRIS, SMITH, COLLINS, and DONNIE, and others known and unknown to

5 the Grand Jury, entered FMK Firearms through a glass window that had

6 been shattered.

7     Overt Act No. 6:   On or about September 2, 2015, defendants

8 HARRIS, SMITH, COLLINS, and DONNIE, and others known and unknown to

9 the Grand Jury, entered SureFire Institute through a glass door that

10 had been shattered.

11     Overt Act No. 7:   On or about September 2, 2015, defendant

12 SMITH forced entry into Rifle Gear by breaking a glass window.

13     Overt Act No. 8:   On or about September 2, 2015, defendants

14 HARRIS, SMITH, COLLINS, and DONNIE, and others known and unknown to

15 the Grand Jury, stole approximately fifty firearms from the premises

16 of Rifle Gear, including hand guns and rifles.

17     Overt Act No. 9:   On or about September 17, 2015, defendants

18 HARRIS, SMITH, and COLLINS forced entry into American Pacific

19 Rifleworks.

20     Overt Act No. 10:   On or about September 17, 2015, defendants

21 HARRIS, SMITH, and COLLINS drove to Warrior One.

22     Overt Act No. 11:   On or about September 17, 2015, defendant

23 SMITH attempted to force entry into Warrior One by breaking a glass

24 door using an ax.

25     Overt Act No. 12:   On or about October 27, 2015, defendant

26 HARRIS drove to Tactical Pro Shop.

27     Overt Act No. 13:   On or about October 27, 2015, defendant

28 HARRIS drove to Gun World.

1    Overt Act No. 14:   On or about October 27, 2015, defendant
2 HARRIS drove to Guns Direct.

3    Overt Act No. 15:   On or about October 29, 2015, defendant
4 HARRIS drove to ExaTactical Firearms.

5    Overt Act No. 16:   On or about October 29, 2015, defendant
6 HARRIS drove to Gun Effects.

7    Overt Act No. 17:   On or about November 7, 2015, defendants
8 HARRIS, SMITH, COLLINS, DONNIE, KEON MENA, DAVELL MENA, and USHER met
9 at a residence on West 53rd Street in Los Angeles, California (the
10 "West 53rd Street residence").

11    Overt Act No. 18:   On or about November 7, 2015, defendant
12 COLLINS drove to ExaTactical Firearms, with defendants HARRIS and
13 SMITH as passengers.

14    Overt Act No. 19:   On or about November 7, 2015, defendant KEON
15 MENA drove to ExaTactical Firearms, with defendants DONNIE, DAVELL
16 MENA, and USHER as passengers.

17    Overt Act No. 20:   On or about November 7, 2015, defendants
18 HARRIS, SMITH, COLLINS, DONNIE, KEON MENA, DAVELL MENA, and USHER
19 stole approximately thirty-nine firearms from the premises of
20 ExaTactical Firearms, including hand guns, rifles, and shotguns.

21    Overt Act No. 21:   On or about November 7, 2015, after
22 burglarizing ExaTactical Firearms, defendants HARRIS, SMITH, COLLINS,
23 DONNIE, KEON MENA, DAVELL MENA, and USHER returned to the West 53rd
24 Street residence with firearms stolen from ExaTactical Firearms.

25    Overt Act No. 22:   On or about November 7, 2015, in a hotel
26 room in Los Angeles, California, defendant HARRIS possessed three
27 pistols stolen from ExaTactical Firearms on November 7, 2015.

28

1     Overt Act No. 23:   On or about November 7, 2015, in a hotel

2 room in Los Angeles, California, defendants KEON MENA and DAVELL MENA

3 possessed two rifles, two revolvers, and three pistols, all of which

4 were stolen from ExaTactical Firearms on November 7, 2015.

5     Overt Act No. 24:   On or about November 7, 2015, at the West

6 53rd Street residence, defendant SMITH possessed a pistol stolen from

7 Rifle Gear on September 2, 2015.

8     Overt Act No. 25:   On or about November 7, 2015, at the West

9 53rd Street residence, defendant USHER possessed two pistols stolen

10 from ExaTactical Firearms on November 7, 2015.

11     Overt Act No. 26:   On or about November 7, 2015, at the West

12 53rd Street residence, defendant USHER possessed a pistol stolen from

13 Rifle Gear on September 2, 2015.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

COUNT TWO

[18 U.S.C. § 922(u)]

On or about August 29, 2015, in Orange County, within the Central District of California, defendants EDDIE LEE HARRIS, JR., also known as "Baby Syke," DERRICK ANTHONY SMITH, BRITTANI NICOLE COLLINS, and KENNETH TERELL MULLEN, stole and knowingly and unlawfully took and carried away from the premises of Orange County Firearms LLC, which was then licensed to engage in the business of importing, manufacturing, and dealing in firearms, approximately thirty-six firearms, including hand guns, rifles, shotguns, and silencers, in and affecting interstate commerce.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT THREE

[18 U.S.C. § 922(u)]

On or about September 2, 2015, in Orange County, within the Central District of California, defendants EDDIE LEE HARRIS, JR., also known as "Baby Syke," DERRICK ANTHONY SMITH, BRITTANI NICOLE COLLINS, and FAIZON AZANTE DONNIE, and others known and unknown to the Grand Jury, stole and knowingly and unlawfully took and carried away from the premises of Uber Inc., a corporation doing business as Rifle Gear Company, which was then licensed to engage in the business of importing, manufacturing, and dealing in firearms, approximately fifty firearms, including hand guns and shotguns, in and affecting interstate commerce.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FOUR

[18 U.S.C. § 922(u)]

On or about November 7, 2015, in Los Angeles County, within the Central District of California, defendants EDDIE LEE HARRIS, JR., also known as ("aka") "Baby Syke," DERRICK ANTHONY SMITH, BRITTANI NICOLE COLLINS, FAIZON AZANTE DONNIE, KEON MENA, DAVELL DEJON MENA, and TEOPHELUS LEE USHER, aka "T.O.," and others known and unknown to the Grand Jury, stole and knowingly and unlawfully took and carried away from the premises of Mr. & Mrs. Pet LLC, a corporation doing business as ExaTactical Firearms, which was then licensed to engage in the business of importing, manufacturing, and dealing in firearms, approximately forty firearms, including hand guns, rifles, and shotguns, in and affecting interstate commerce.

COUNT FIVE

[18 U.S.C. § 922(g)(1)]

On or about November 7, 2015, in Los Angeles County, within the Central District of California, defendant EDDIE LEE HARRIS, JR., also known as "Baby Syke" ("HARRIS"), knowingly possessed the following firearms, in and affecting interstate and foreign commerce:

(1)  a CZ model Scorpion Evo 3 S1 9mm pistol, bearing serial number B823209;

(2)  a Springfield Armory model Operator .45 caliber pistol, bearing serial number NM414362; and

(3)  a Sig Sauer model P226 9mm pistol, bearing serial number 47A118368.

Such possession occurred after defendant HARRIS had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)  Voluntary Manslaughter, in violation of California Penal Code Section 192(a), in the Superior Court for the State of California, County of Los Angeles, case number YA064219, on or about June 29, 2007;

(2)  Resisting an Executive Officer, in violation of California Penal Code Section 69, in the Superior Court for the State of California, County of Los Angeles, case number YA064193, on or about June 29, 2007;

(3)  Second Degree Commercial Burglary, in violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles, case number SA0870501, on or about July 15, 2014.

11

COUNT SIX

[18 U.S.C. § 922(g)(1), (9)]

On or about November 7, 2015, in Los Angeles County, within the Central District of California, defendant DERRICK ANTHONY SMITH ("SMITH") knowingly possessed a firearm, namely, a Springfield Armory model XD40 .40 caliber pistol, bearing serial number XD351774, in and affecting interstate and foreign commerce.

Such possession occurred after defendant SMITH had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)   Receiving Stolen Property, in violation of California Penal Code Section 496(a), in the Superior Court for the State of California, County of Los Angeles, case number BA389818, on or about October 20, 2011;

(2)   First Degree Residential Burglary, in violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles, case number YA089674, on or about August 26, 2014.

Furthermore, such possession occurred after defendant SMITH had been convicted of at least one of the following misdemeanor crimes of domestic violence:

(1)   Domestic Battery, in violation of California Penal Code Section 243(e)(1), in the Superior Court for the State of California, County of Los Angeles, case number 2CP02071, on or about May 14, 2012;

(2)   Corporal Injury to Spouse, a misdemeanor violation of California Penal Code Section 273.5(a), in the Superior Court for

//

12

1   the State of California, County of Los Angeles, case number

2   2AV08736, on or about January 30, 2013.

3

4                                        A TRUE BILL

5

6                                        /S/
                                         _____
                                         Foreperson
7

8   EILEEN M. DECKER
    United States Attorney
9

10

11  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
12  Chief, Criminal Division

13  DENNISE D. WILLETT
    Assistant United States Attorney
14  Chief, Santa Ana Branch Office

15  SCOTT D. TENLEY
    Assistant United States Attorney
16

17

18

19

20

21

22

23

24

25

26

27

28

                                13



**hkaybabylo**
City of Los Ang...

Following

52w

21 likes

**hkaybabylo** Free my crip k bone on hkood @strxctlyff

**nena_motherof2** Niggahs got big hunnits😂😂😂🤑

**datguyvic** Its good to see you solid my guy 1000

**nonna_thahotgirl** Free KenKen 🤟🤟🤟 all isee is BIG FACE hunnitsssss💰💰💰

**lsb_is_winning** That's daddy 😂😂@hkaybabylo

**harvard.st** Youu see it 🤙

Add a comment...

